UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------X
MARIA CINTRON, et al.,        :
                              :
            Plaintiffs        :
                              :
     v.                       :        NO. 3:69cv13578 (EBB)
                              :
THOMAS VAUGHN, et al.,        :
                              :
            Defendants        :
                              :
-----------------------------X
```

## RULING ON DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON MOTION FOR CONTEMPT

Defendants have timely filed objections to the Special Master's Report relating to Plaintiffs' Motion for Contempt [Doc. No. 85]. In addition, City of Hartford Mayor Eddie Perez has filed a separate set of objections. The Court has duly considered both sets of objections and has reviewed the record before the Special Master *de novo*. For the reasons set forth below, the Report [Doc. No. 112] is adopted in part and rejected in part.

## BACKGROUND

### A. Factual Background

On March 14, 2005, Plaintiffs filed a motion for contempt alleging that Defendants had violated the 1973 Consent Decree ("Consent Decree") in this case by failing to comply with a 2004 Order issued by this Court. [Doc. No. 85]. This motion for

contempt was referred to Special Master Richard Bieder. On June 29, 2007, Special Master Bieder filed his Report and Recommendations, finding that Defendants had violated certain provisions of the 2004 Order in contempt of the Consent Decree and recommending sanctions for their behavior. [Doc. No. 112]. Pursuant to Rule 53(g)(2), Defendants timely submitted their objections to Special Master Bieder's findings of fact and recommendations. [Doc. No. 118]. In addition, the Mayor of the City of Hartford, Eddie Perez ("Mayor Perez" or "the Mayor"), submitted his own objections. [Doc. No. 121]. These objections primarily addressed the Special Master's recommendation that the Mayor be added as a Defendant in this action.

In 1969, a class of Hartford residents who were "members of the Black or Puerto Rican-Spanish racial group or both" challenged an alleged systematic pattern of police misconduct and discrimination toward members of racial minority groups. Pursuant to 42 U.S.C. §§ 1981 and 1983, seven defendants were sued in their individual and official capacities: the chief of police, the city manager, the director of personnel and a captain, a sergeant and two officers in the police department. The Plaintiffs did not sue the Mayor or the City of Hartford, nor did they sue any members of the Hartford Court of Common Council ("City Council"). On May 11, 1973, the Court (Blumenfeld, J.) found that this action was properly a class action. Counsel for the parties engaged in

extensive negotiations, agreeing to a settlement that was entered by the Court as a Consent Decree [Doc. No. 107][1].

Of relevance to the issues before the Court on this motion is Section II of the Consent Decree. This section, titled "Operations", states that:

> "The Hartford Police Department has adopted a regulation, Standard Operating Procedure 73-5 providing for the internal review of complaints against police officers. Complainants have the right to file complaints of alleged misconduct either personally or in writing. Said complaint Forms are in English and Spanish. Complainants receive a written reply of the investigation. Provision is made for the assistance of community leaders to complainants. All witnesses available are questioned. Officers are protected by due process and the grievance procedure. A procedure is established for alleged criminal charges filed by the complainant. A proper bookkeeping system is established to index complaints and prepare reports." [Doc. No. 107].

## B. Appointment of the Special Master

---

[1]Mayor Perez challenges this term, arguing that the what transpired in 1973 was merely a "settlement stipulation". However, as this Court has already recognized, the "terms and conditions of [this] settlement stipulation . . . [were] approved by this court and entered, on June 21, 1973, as a consent decree." Pollard v. City of Hartford, 539 F. Supp. 1156, 1162 (D. Conn. 1982). Defendants themselves have characterized the court's order as a consent decree. See e.g. Doc. No. 118 at 9. Indeed, the various motions filed by Defendants over the years have been unwavering in their characterization of the Court's order as a consent decree. See, e.g. Defs.' Opp to Mot to Intervene, August 9, 2000 [Doc. No. 42]; Defs.' Opp. to Mot. for Contempt, April 26, 2005 [Doc. No. 95]. The Order itself states that "the Plaintiffs and Defendants agree that a consent Judgment shall enter in accordance with the Federal Rules of Civil Procedure." [Doc. No. 107]. In issuing the order, Judge Blumenfeld wrote that "this stipulation is approved, and it shall constitute the decree of this court." [Doc. 3 at Ex. A].

With two inconsequential exceptions[2], this case remained
dormant until September 1999, when the original Plaintiffs filed a
motion for contempt alleging that Defendants' "noncompliance with
the [C]onsent [D]ecree created an environment in the H[artford]
P[olice] D[epartment] that led to the fatal shooting of 14-year-old
Aquan Salmon on April 13, 1999." [Doc. No. 2]   A group of
interested religious and community organizations from Hartford
filed a motion the same day seeking to intervene [Doc. No. 1] and
pushed for the appointment of a special master to oversee the
Hartford Police Department ("HPD").   After initially opposing this
appointment of a special master, the City Council resolved to drop
its opposition on November 23, 1999. [Doc. No. 17]. On March 1,
2000, the City Manager for the City of Hartford entered into a
stipulation providing for the appointment of Special Master Richard
Bieder.   [Doc. No. 28]. This stipulation stated that the Special
Master "shall have the power to make decisions on disputes between
the parties regarding the enforcement of the Consent Decree . . .
shall have the duty to conduct hearings to determine whether or not
the Consent Decree has been violated . . . [and] shall have the
responsibility and duty to oversee all aspects of the Consent
Decree . . ." Id.   On May 11, 2000, this court entered an "Order

---

[2]In 1981, a group of minority police officers moved to intervene to
represent their interests in the department's promotional policies.  This
motion was withdrawn four years later.  In 1990, Defendants sought
successfully to modify the consent decree to permit officers to carry their
semi-automatic service weapons while off duty.  See Cintron v. Vaughan, No.
3:69-cv-13578, 2000 WL 620427 at * 2, fn. 3 (D. Conn. March 15, 2000).

4

of Reference" in accordance with this stipulation. [Doc. No. 35].

Special Master Bieder's appointment was later extended to October

1, 2004, [Doc. No. 68], before he was reappointed for a second two

year term on October 1, 2004. [Doc. No. 76]. On October 16, 2006,

Defendants moved to terminate the duties of the Special Master

because (1) the appointment had expired, (2) the Defendants did not

consent to further proceedings before the Special Master and (3)

"the City of Hartford, a non-party to this matter, is no longer

willing to bear the costs of the Special Master, which it only

agreed to undertake for a two-year period." [Doc. No. 107].

The Court declined to terminate the services of the Special

Master, stating that he had "*sua sponte* offered his continued

services *pro bono*, which the court accepts with gratitude, and his

appointment is continued *nunc pro tunc* from October 1, 2006 to

October 1, 2007." [Doc. No. 108]. Defendants filed a motion for

reconsideration of this ruling, arguing that the Special Master's

impartiality was in question [Doc. No. 109]. The Court denied this

motion and extended the Special Master's appointment to October 1,

2008.

### C. The 2004 Order and the Present Motion for Contempt

On June 30, 2004, the parties reached an agreement putting

into place a Citizen Complaint Procedure. Through various

mechanisms, this Procedure sought to improve the HPD's

investigation of citizen complaints alleging police misconduct and

to eliminate the backlog of complaints against the Department. <u>See</u> [Doc. No. 74]. This agreement was entered as an Order of the Court (hereinafter the "2004 Order") and superceded "any rule, regulation, ordinance, document, procedure or prior Order of this Court that is inconsistent with the provisions of the Citizen Complaint Procedure . . ." [Doc. No. 74].

On November 24, 2004, Plaintiffs sent a letter to the corporation counsel of the City of Hartford "notifying [them] that the City of Hartford is in violation of the Federal Court Orders, specifically the Citizen Complaint Procedures, which were approved and ordered by Judge Ellen Bree Burns on June 30, 2004." Pl. Ex. 34. The letter alleged five violations of the 2004 Order and recounted the high profile cases of a police officer accused of tampering with the evidence in an undercover drug case and a police officer accused of shooting a suspect. The letter argued that "the continued disregard and contempt for the agreed Citizen Complaint Procedure Order sets the tone, if not provides the environment, for individuals in the Hartford police force to act with criminal intent and behavior when enforcing the law." <u>Id.</u> The letter also requested an immediate meeting between city officials and the Cintron Plaintiffs Negotiating Committee and stated that if matters were not resolved by December 13, 2004, Plaintiffs would ask the Special Master for an immediate hearing on contempt motions. There is no evidence that Defendants made any attempt to contact the

Plaintiffs or their representatives. See Tr. 509-512, 1809-1822, 3983-3984[3].

On March 15, 2005, Plaintiffs filed a motion for contempt alleging that Defendants had violated the Court's 2004 Order. [Doc. No. 85]. Specifically, Plaintiffs requested that the Court find Defendants in contempt "for: 1) failing to implement the computerized program [to track citizen complaints], 2) failing to train community-based organizations [("CBOs")] in the processing of complaints, including La Casa De Puerto Rico, One-Chane and the NAACP Hartford Branch and 3) failing to appoint at least 8 investigators to Internal Affairs to clear up the backlog of citizen complaints, all as ordered by the Court." [Doc. No. 85]. Plaintiffs asked that Defendants be fined $50,000 and be ordered to implement the computer program, train CBOs and add additional investigators to Internal Affairs. Id.

This Court referred the motion for contempt to Special Master Bieder on March 16, 2005. [Doc. No. 87]. On August 11, 2005, Defendants moved to modify the 2004 Order by deleting the following

---

[3] In all, the Special Master conducted hearings over twenty-six days from March 2005 to April 2007. These hearings concerned both the motion for contempt that is the subject of the Report presently before the Court, as well a second motion for contempt alleging that Defendants had violated the Consent Decree by failing to properly investigate a police shooting of a civilian. The first twenty hearing dates (March 30, 2005; April 1,5,6,12,14,26, 2005; May 10,11,25, 2005; June 9,16, 2005; Aug. 9,10,11, 2005; Jan, 24,25, 2006; March 22,23, 2006 and April 27, 2006) were recorded on one transcript, which is cited simply as "Tr." The last six hearing dates (Sept. 22,28, 2006; Oct. 3, 2006; Nov. 1,28, 2006 and April 10, 2007) were recorded on six separate transcripts. These transcripts are cited by the date on which they were recorded (e.g. "9/22/06 Tr.").

section: "for calendar years 2004-2006, the Internal Affairs Division shall be staffed by a Commander and at least 8 investigators to enable Internal Affairs to clear the backlog of citizen complaints." [Doc. No. 102]. Submitting that they had had significant progress in addressing outstanding citizen complaints[4], Defendants asserted that there was no longer a need for additional staffing to resolve the backlog. This motion was never ruled upon.

### D. The Special Master's Report

Special Master Bieder found Defendants and Mayor Perez in contempt of the Consent Decree, finding that they had violated the following five provisions of the 2004 Order:

(1) **Section II.c**, which mandated that for fiscal years 2004-2006, the Internal Affairs Division (IAD) be staffed by a Commander and "at least 8 investigators to enable Internal Affairs to clear the backlog of citizen complaints" [Doc. No 112 at 26-32] (hereinafter the "Eight IAD Investigators" provision);

(2) **Section I.b**, which provided that citizens could file complaints with community based organizations ("CBOs"), and that the City's Office of Human Relations and the HPD would train these CBOs on the citizen complaint process, including appeal to the Civilian Police Review Board [Doc. No. 112 at 32-34] (hereinafter the "Training CBOs " provision);

(3) **Section II.g.**, which required that the investigation of a

---

[4]Specifically, Defendants represented that "the backlog as of June 21, 2004 consisted of 94 open citizen complaint cases. As of August 10, 2005, the investigations in 93 of these have been completed. From June 21, 2004 through August 8, 2005, 132 citizen complaints were received. As of August 10, 2005, the investigations in 115 of these have been completed. Of the 17 remaining cases, only 6 have been open for more than 30 days, and diligent efforts are made toward their completion." [Doc. No. 102].

citizen complaint "shall be concluded" within 30 days of receipt of the complaint, a written status report would be submitted to the Commander of IAD if circumstances caused a delay beyond 30 days and that written authorization for a time extension beyond 45 days must be requested from the chief of police [Doc. No. 112 at 39] (hereinafter the "30 Days to Completion" provision);

(4) **Section II.i**, which required that the complainant, in a case where his complaint has been sustained, be notified within 15 days of the conclusion of the disciplinary proceeding against the officer involved [Doc. No. 112 at 42] (hereinafter the "Notify Citizen Within 15 Days of Disciplinary Proceeding" provision); and

(5) **Section II.j**, which mandated that, if the citizen complaint was not sustained, the Commander of IAD "shall cause notification in writing" to be mailed to the complainant at the address on the complaint (and to the Director of the Office of Human Relations)along with a summary report, a brochure explaining the Civilian Police Review Board process and a Request for Review/Investigation Form [Doc. No. 112 at 43] (hereinafter the "Send a Summary Report, Brochure or Appeal Form" provision).

The sanctions that Special Master Bieder recommended for these violations principally called for Plaintiffs and Defendants to meet and confer on measures that would prevent future violations of these provisions.  See [Doc. No. 112 at 47-55].

## STANDARD OF REVIEW

### A. Rule 53

Rule 53(a)(1) provides that a court may appoint a master only to:

> "(A) Perform duties consented to by the parties;
> (B) hold trial proceedings and make or recommend findings of fact on issues to be decided by the court without a jury if appointment is warranted by (i) some exceptional condition, or (ii) the need to perform an accounting or resolve a difficult

> computation of damages; or (C) address pretrial and
> post-trial matters that cannot be addressed
> effectively and timely by an available district
> judge or magistrate judge in the district."

In general, a special master has "broad discretion to regulate the manner in which he will complete his duties." United States v. Clifford Matley Family Trust, 354 F.3d 1145, 1161 (9th Cir. 2004), see also Schneider v. Feinberg, 345 F.3d 135, 149 (2d Cir. 2003). Rule 53(c) provides that "[u]nless the appointing order expressly directs otherwise, a master has the authority to regulate all proceedings and take all appropriate measures to perform fairly and efficiently the assigned duty."

The district court must decide *de novo* all objections to findings of fact and conclusions of law made or recommended by the master. Fed. R. Civ. P. 53(g)(4). In acting on the master's report, the Court may adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with instructions. Fed. R. Civ. P. 53(g)(1).

### B. Contempt

A contempt order is a "potent weapon". International Longshoreman's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 208 (1967). A criminal contempt sanction is "imposed to punish for an offense against the public and to vindicate the authority of the court." N.Y. State Nat'l Org. For Women v. Terry, 159 F.3d 86, 93 (2d Cir. 1998). By contrast, a

civil contempt sanction serves two purposes: "to coerce future compliance and to remedy any harm past noncompliance caused the other party." Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996), citing United States v. United Mine Workers of America, 330 U.S. 258, 302-04, 67 S.Ct. 677, 700-01 (1947). The Second Circuit has noted that "[s]o far as the first of these [civil contempt] functions is concerned, the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy." Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979). Thus, although a district court "may not impose obligations on a party that are not unambiguously mandated by the decree itself," King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995), it is axiomatic that a district court has "the inherent power to enforce compliance with [its] lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535 (1966).

A civil contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict. King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995), citing Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc., 341 F.2d 101, 102 (2d Cir. 1965) (per curiam). Specifically, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and

11

convincing and (3) the contemnor has not diligently attempted to comply in a reasonable manner. Paramedics Electromedicina Commercial, LTDA v. GE Medical Systems Information Technologies, Inc., 369 F.3d 645, 655 (2d Cir. 2004) (citations omitted).

When determining the nature or amount of a civil contempt sanction, a district court "is obliged to use the least possible power adequate to the end proposed." Spallone v. United States, 493 U.S. 265, 276, 110 S.Ct. 625 (1990). The court "should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1353 (2d Cir. 1989), citing Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d Cir. 1987).

## DISCUSSION

For the reasons stated below, the Court affirms and adopts the Special Master's Report and Recommendations in large part, subject to the following rejections. First, the Court rejects two of the Special Master's contempt findings and two of his proposed sanctions. Second, the Court rejects three of the Special Master's findings of fact. Although these erroneous facts were not the basis of the Special Master's contempt findings, Defendants have raised valid objections to their inclusion in the Report.

12

## A. The Special Master's Findings

The Special Master found Defendants in contempt of five provisions of the 2004 Order. As explained below, the Court rejects two of the Special Master's contempt findings and adopts the rest.

### (1) Eight IAD Investigators Provision

Special Master Bieder found that Defendants and Mayor Perez had violated the Eight IAD Investigators provision. He found that it was clear and unambiguous that this provision required Defendants to staff the IAD with 8 investigators from 2004-2006 and that "IAD investigators", not officers drawn from other departments on the force, be used to meet this staffing requirement. Special Master Bieder found that by using non-IAD officers as part-time investigators (a fact not disputed by Defendants), Defendants failed to diligently attempt to comply with this provision. [Doc. No. 112 at 28].

As Special Master Bieder noted, the 2004 Order was the result of extensive negotiations on the part of both parties. Plaintiffs bargained for and expected to receive eight IAD investigators. Defendants' argument that the backlog was ultimately cleared despite the understaffing is unpersuasive, for had they complied fully with the provision, the backlog would have been reduced sooner. Tr. 1089

Moreover, the Court agrees that the provision clearly and unambiguously called for civilian complaints to be investigated by IAD officers and that Defendants violated the provision by using non-IAD officers. Although the Chief of Police of Hartford testified that he believed the provision merely called for IAD officers to manage the investigation, with non-IAD personnel conducting the actual investigation, this interpretation is at odds with the clear language of the provision. As Special Master Bieder stated, "[t]his provision of the 2004 Order is crystal clear – it says 'IAD investigators' are to be appointed and used. It does not say, as defendants would have to be true, that it is a diligent attempt to comply with that clear order in a reasonable manner by 'taking officers from anywhere' and have them do the investigations (part time)". [Doc. No. 112 at 27], <u>citing</u> Tr. at 406, 738, 750, 2208.

However, the Court cannot hold Defendants in civil contempt of this provision. By its own terms, the provision required eight IAD investigators only for the years 2004-2006. When Plaintiffs brought their motion for contempt in 2005, it is clear from the above evidence that Defendants were in contempt. However, under the present circumstances, the Court cannot hold Defendants in contempt because the provision has now expired.

(2) Training CBOs provision

Special Master Bieder found that the 2004 Order's directive

14

that the HPD train CBOs about the citizen complaint process was clear and unambiguous. Although there was no time limit set in the order, Special Master Bieder held that the Defendants "would have been acting diligently, and reasonably, if they had begun the training within one or two months of the order." [Doc. No. 112 at 33]. Instead, Defendants waited until after Plaintiffs filed their December 16, 2004 contempt motions to take action. On December 22, 2004, Defendants held an emergency meeting at which both Mayor Perez and Chief Harnett (the Chief of the Hartford Police Department) were present. Within two to five weeks of that meeting, the training was held. [Doc. No. 112 at 33], _citing_ Tr. 1032-33. This lengthy delay occurred despite the fact that the Director of Human Relations for the HPD had read the 2004 Order within one week of its issuance. Tr. 435-36. The Court agrees that this lengthy and unnecessary delay was clear and convincing evidence of Defendants' initial noncompliance with the 2004 Order. However, Defendants initiated action to correct their failure shortly after the contempt motion was filed, and within approximately six weeks, began training CBOs. _See_ Tr. 439. Thus, Defendants cannot be held in contempt of violating this provision.[5]

_____

[5]Special Master Bieder's recommended sanction for the violation of this provision was for the parties to "meet and confer about whether the continued use of the CBO sections of the 2004 Order is warranted, in light of the testimony that no citizen complaints were filed through the use of any of the 3 CBOs. If those sections are to be continued, the meeting should be used to confer about revisions to the training . . ." [Doc. No. 112 at 52]. Although the Court does not find Defendants in contempt of this provision, the Special Master possesses the power to "oversee all aspects of the Consent Decree". Whether or not the use of CBOs should be continued certainly falls within this

(3) 30 Days to Completion Provision

Third, Special Master Bieder found that it was clear and unambiguous that the Court specifically directed that IAD conclude its investigation within 30 days of receiving a complaint, and that the administrative process to be used if investigations were not completed within 30 days was put into place "to show that it is simpler and more effective to just get the investigation done in 30 days than lingering, except if there are real reasons for not getting it done in time . . ." [Doc. No. 112 at 40]. The Special Master also found clear and convincing evidence that these timeline and written status report requirements were neither imposed nor performed. For example, testimony adduced at the hearing showed that the Commander of the IAD, Lieutenant Neil Dryfe, did not insist on a written report because asking for a report and a projected completion date would have been "an exercise in futility" given the lack of personnel for the investigations. Tr. 772-73. Testimony also showed that written authorization for cases not completed within 45 days was rarely requested from the Chief of Police because "at the present time [the HPD] routinely cannot meet the 30-day or 45-day deadline." Tr. 773-74. Special Master Bieder reasoned that the requirements geared to the 30 and 45-day timelines were based on IAD being assigned 8 investigators, and that had there been 8 full-time investigators, those requirements

oversight power. Thus, the Court endorses this recommendation.

16

would have been met. [Doc. No. 112 at 40], <u>citing</u> Tr. 1490-91 (Lieutenant Dryfe testifying that it would have been "much easier" to meet these requirements with more investigators). Thus, "in the face of clear and unambiguous timelines and clear and convincing evidence of missing those timelines, Plaintiffs clearly and convincingly showed that the Defendants were not diligent or reasonable in this regard." [Doc. No. 112 at 41]. The Court agrees.

(4) Notify Citizen Within 15 Days of Disciplinary Proceeding Provision

Special Master Bieder found this provision to be clear and unambiguous. He noted that, although letters did go out to complainants after the Chief of Police completed his review of an incident, "almost universally, letters do not go out after the conclusion of the disciplinary proceedings." [Doc. No. 112 at 43], <u>citing</u> Tr. 1512-1513 (testimony that "there has not been a followup notification letting them know what the result of the disciplinary proceeding was."). Based on this testimony, the Court agrees that there was clear and convincing proof of noncompliance and no evidence that Defendants had diligently attempted to comply with the provision in a reasonable manner.

(5) Send a Summary Report, Brochure or Appeal Form Provision

Finally, in cases where a complaint was not sustained, the

2004 Order required that the complainant receive (1) notification of the outcome, (2) a summary report, (3) a brochure explaining the civilian police review board process and (4) a form request for review/investigation. Special Master Bieder found, and the Court agrees, that this provision was clear and unambiguous and that there was clear and convincing evidence that these procedures were not followed. For example, testimony from Lieutenant Dryfe, Commander of the IAD, established that these materials had never even been created, let alone used:

"Q:  On those that are not sustained, do you send along a summary report, whatever that is?

A:   No, I do not. Because I don't know what that is either.

Q:   Okay. So we will have to decide what that is. And do you send along a brochure explaining the Civilian Police Review Board process and a request for a review/investigation form?

A:   No. As far as I know, those – there is no such brochure and/or form explaining that process."

Tr. 1518.

Defendants raise two additional objections to the Special Master's findings of contempt, both of which the Court rejects.

First, Defendants argue that the Special Master erred in considering violations not raised in Plaintiffs' motion for

contempt.[6]

In general, a district court's decision to *sua sponte* hold a party in civil contempt is disfavored, because "a person charged with civil contempt is entitled to notice of the allegations, the right to counsel, and a hearing at which the plaintiff bears the burden of proof and the defendant has an opportunity to present a defense." <u>Fonor Corp. v. Magnetic Resonance, Inc.</u>, 128 F.3d 99, 102 (2d Cir. 1997) (internal quotations omitted); <u>see also</u> <u>United States v. Russotti</u>, 746 F.2d 945, 949 (2d Cir. 1984) [stating that "at least in the context of civil litigation, it has been held that a civil contempt for failure to obey a court order may not be initiated by the trial judge, but is a remedy available only for the benefit of the parties who obtained the order in issue (citing <u>MacNeil v. United States</u>, 236 F.2d 149, 153-55 (1st Cir. 1956)]. Vindication of the court's authority is normally accomplished by criminal contempt. <u>Id.</u>

However, in <u>SEC v. American Board of Trade, Inc.</u>, 830 F.2d 431 (2d Cir. 1987), the Second Circuit upheld a district court's *sua sponte* finding of civil contempt against a party. In this case, the district court had found that defendants, the American Board of Trade (ABT), had violated the Securities Act by selling

---

[6]The latter three provisions discussed (30 Days to Completion, Notify Citizen Within 15 Days of Disciplinary Proceeding, and Send a Summary Report, Brochure or Appeal Form) were not raised by Plaintiffs in their motion for contempt.

unregistered securities in the form of short-term unsecured notes issued by ABT. The district court issued an injunction freezing all assets of the notes program and prohibiting the redemption of these notes. It also appointed a receiver with power to approve or disapprove expenditures by ABT. The court found that the defendant, the head of ABT, had violated the court's order by redeeming a large number of notes, failing to cooperate with the receiver, and continuing to expend corporate assets in violation of the court's express order. 830 F.2d at 434. The court initiated civil contempt proceedings against the defendant, and after a five-day hearing, ordered him to make restitution to ABT in the amount of the redeemed notes.

The Second Circuit admitted that this *sua sponte* finding of civil contempt was unique and noted that the "danger in allowing district courts to initiate civil contempt proceedings is that civil contempt sanctions may be used solely to evade the procedural constraints that attend criminal contempt proceedings." Id. at 441.[7] However, it found that the circumstances of that case

---

[7]In MacNeil v. United States, the First Circuit vacated a civil contempt finding, stating:

"It is clear that in a criminal contempt proceeding both a fine and imprisonment may not be imposed for a single act of contempt.... It is equally clear that both may be imposed where the same act constitutes civil and criminal contempt. So long as civil contempts are restricted to those initiated by the parties primarily in interest we see nothing objectionable in the double sentence – one remedial, the other punitive. We believe, however, that such a double sentence is not proper where the parties primarily in interest have not complained and where the trial judge, in effect, seeks to turn the remedial sentence for civil contempt into additional punishment for an offense to the public interest. If the court may accomplish this by merely

justified the *sua sponte* resort to the civil contempt remedy because "the injunction violated by [the defendant] was designed to protect persons who were not parties to the action and were too numerous and too ill-informed to protect their own interests." Id. The Second Circuit analogized the court's duty to protect these non-parties to the obligations a court has in reviewing settlements of a class action, where "the court's obligations to protect the class are quite independent of the initiative or wishes of class representatives, named plaintiffs, or class members who appear at the relevant hearing." Id. Finally, the Court stated that critical to its decision to uphold the district court's civil contempt finding was (1) the fact it was not punitive, but carefully tailored to restore ABT's noteholders to the position they would have been in had the injunction been obeyed and (2) the fact that the SEC now endorsed the resort to civil contempt as necessary to protect the rights of these ABT noteholders. Id. at 441-42.

In the instant case, Special Master Bieder's proposed sanctions are not punitive and are narrowly tailored to prevent future violations of these three provisions. Moreover, the 2004 Order affects not only the named Cintron Plaintiffs, but the residents of Hartford as a whole. Finally, although Defendants did

---

adding the word "civil" to his charge of criminal contempt then the provisions of [18 U.S.C.] § 401 [governing criminal contempts] become meaningless." 236 F.2d at 154-55.

not have prior notice of these specific allegations of violations of the 2004 Order, they were fully litigated at the hearings before Special Master Bieder, where Plaintiffs had the burden of proof and where Defendants had counsel present.  Thus, a civil contempt finding with respect to the provisions not raised by Plaintiffs in their motion for contempt is proper in this case.

Defendants' second objection is that the findings of contempt were impermissibly based upon the Special Master's review of 75 IAD files.  They claim that the use of these files was impermissible because it constituted "fact-finding engaged in by the Special Master." [Doc. No. 118 at 39].

Defendants had previously objected to the introduction of the Special Master's notes in his review of these files as an exhibit.  Tr. 3958-3959.  This objection was sustained.  11/03/06 Tr. 10.  However, neither party objected to the introduction of the files themselves as full exhibits.  See 4/10/07 Tr. 7.  These files were admitted evidence that the Special Master was entitled to use in drafting his Report.

In addition, even assuming *arguendo* that it was improper for the Special Master to refer to these IAD files in making his findings of contempt, there was ample independent evidence establishing the Defendants' violations.

First, as previously noted, testimony adduced at the hearing

clearly and convincingly established that Defendants violated the "30 Days to Completion" Provision and the "Send a Summary Report, Brochure or Appeal Form" Provision. Special Master Bieder did not rely on the IAD files, nor did he need to, in reaching the contempt findings with respect to these two provisions. <u>See</u> [Doc. No. 112 at 39-41; 43-45).

In concluding that Defendants violated the 2004 order by not notifying complainants within 15 days of the conclusion of a disciplinary proceeding, Special Master Bieder stated that he had reviewed the IAD files and cited testimony from the hearing. <u>See</u> [Doc. No. 112 at 43]. On its own, the testimony he cited from Lieutenant Dryfe was clear and convincing evidence that Defendants violated this provision:

"A: No, they have not been notified. There has not been a follow-up notification letting them know what the result of the disciplinary proceeding was.

Q: Do you understand that to be that which is required by subsection I?

. . .

A: I do now. That was not my understanding until shortly after receiving your subpoena on Friday.

Q: So before receiving that subpoena, for whatever the reason was, you did not understand it, that was not being done?

A:    My understanding of what I was supposed to do was to notify
      the complainant of the outcome of the citizen complaint
      investigation.  Not the outcome of any disciplinary proceeding
      . . ."

Tr. 1513.

Defendants also made a number of objections to the Special
Master's findings of fact.  After reviewing the record, the Court
adopts the findings of fact subject to the modifications below.

First, as background information, Special Master Bieder
recited the allegations and claims for relief in Plaintiffs' 1969
Complaint.  Although he characterized the statements in the
Complaint as allegations (and not facts) [Doc. No. 112 at 6], he
also stated that "[f]rom early in the Cintron case, the overall
claims of the Plaintiffs were clearly established." [Doc. No. 112
at 16].  As Defendants correctly point out, this finding was
erroneous.  These allegations were never proven, or even tested in
court.  In entering into the Consent Decree, the parties stated
that "the Plaintiffs and Defendants do hereby stipulate and agree
to a consent judgment and respectfully request the court to enter
same based upon the agreement herein and without reference to the
affirmance or denial of the allegations contained in the
Plaintiff's complaint."  Consent Decree, § V [Doc. No. 107. Ex. 1]

Second, the Special Master erred in stating that "[t]he

Plaintiffs and the Defendants jointly requested that the undersigned be appointed as a Special Master." [Doc. No. 112 at 9]. As Defendants point out, only the City Manager acquiesced to this appointment and Defendants have tried on several occasions to terminate Special Master Bieder's appointment.

Third, the Court must reject Special Master Bieder's finding of fact with respect to the parties' underlying motivations for entering into the agreement which produced the 2004 Order. Although it was reasonable for Special Master Bieder to assume that the "overall goal of all the parties was to restore the confidence that the community should have in its police department, and to improve the effectiveness of law enforcement in Hartford," there was no evidence demonstrating this was the goal of both parties. In addition, there was no evidence demonstrating that both parties thought the 2004 Order was "the best way to proceed." [Doc. No. 118 at 19].

**B. The Special Master's Recommended Sanctions**

Except for the two sanctions discussed below, the Court adopts all of the sanctions recommended by the Special Master.[8]

First, the 2004 Order stated that "if the allegations are of a serious nature, the [Commander of the Hartford Police Department

---

[8]For the sake of brevity, the Court will not re-state these sanctions, which comprise nine pages of the Special Master's Report. See [Doc. No. 112 at 47-55].

Internal Affairs Division] shall cause the complaint to be investigated in accordance with standard applicable Hartford Police Department policies and procedures *including questioning all available witnesses.*" Section 2.f.2 (emphasis added). Special Master Bieder found the phrase "all available witnesses" to be clear and unambiguous, but held that the Plaintiffs had failed to show that Defendants did not act reasonably and diligently in attempting to contact all available witnesses. Nonetheless, he stated that "because of the positive contempt finding on a number of violations complained about by Plaintiffs, and because of the numerous pre 2004 Order violations when [the Consent Decree] was in effect[9], a remedy is recommended to insure that close watch is kept on this issue." [Doc. No. 112 at 39]. He recommended that the Parties meet and confer "about a system that would allow Plaintiffs to regularly review the IAD files to monitor whether all available witnesses are being interviewed." [Doc. No. 112 at 54].

The Court agrees with Defendants that the Special Master erred in recommending this sanction. First, the Special Master expressly found that Plaintiffs had failed to show that Defendants did not reasonably and diligently attempt to comply with this provision. Second, the proposed sanction, which would allow Plaintiffs continuing access to IAD files, imposes a supplementary obligation

---

[9]Section 2.1 of the Consent Decree also contained the language regarding "all available witnesses". [Doc. No. 107].

on Defendants that is beyond the scope of the 2004 Order. See e.g. United States v. Int'l Brotherhood of Teamsters, 998 F.2d 1101, 1107 (2d Cir. 1993) (stating that "[a] court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals."). Therefore, the Court rejects this proposed sanction.

Second, the Court rejects the recommended sanction that would require the HPD to transfer an additional officer with former IAD experience (or an additional officer with IAD training) to temporary full-time duty in the IAD if there are more than 10 complaints that are older than 60 days, and keep that additional officer in the IAD until the backlog is brought back to zero cases over 60 days old. [Doc. No. 112 at 49]. It is clear that the purpose of this sanction was to prevent a recurrence of the backlog of citizen complaints that prompted the 2004 Order. See, e.g. Section II.c. However, the 2004 Order requires only that the IAD be staffed "by a Commander and at least 4 investigators". Id. To impose additional staffing requirements would go beyond the scope of the 2004 Order. Absent any evidence that the current backlog of citizen complaints requires such a measure, this Court will not impose such an obligation on Defendants.

### C. Mayor Perez's Objections

Mayor Perez makes three general objections to the report: (1) this Court lacks the jurisdiction to enforce the Consent Decree,

(2) as a non-party to this litigation, he cannot be held in contempt and (3) the proposed contempt findings are unsupported by the evidence[10].

First, Mayor Perez argues that because the Consent Decree contained no express future enforcement or monitoring provisions, its enforcement is a matter of state contract law and does not fall within the jurisdiction of this Court.  The Court disagrees.

It is well settled that consent decrees embody elements of both contracts and judicial decrees.  <u>Firefighters v. Cleveland</u>, 478 U.S. 501, 519, 106 S.Ct. 3063 (1986); <u>see</u> <u>also</u> <u>Berger v. Heckler</u>, 771 F.2d 1556, 1567-68 (2d Cir. 1985) (noting that "consent decrees are a hybrid in the sense that they are at once both contracts and orders; they are construed largely as contracts, but are enforced as orders."); <u>Buckhannon Bd. & Care Home Inc. v. West Virginia Dep't of Health & Human Res.</u>, 532 U.S. 598 n.7, 121 S.Ct. 1835 (2001)(distinguishing between private settlements and consent decrees by noting that the former "do not entail the judicial approval and oversight involved in consent decrees.").

Consent decrees reflect not only "an agreement of the parties," but also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and

---

[10]As already explained, the Court finds that four of the Special Master's contempt findings were supported by the evidence.

decrees." <u>Rufo v. Inmates of Suffolk County Jail</u>, 502 U.S. 367, 378, 112 S.Ct. 748 (1992).

Because consent decrees are "entered into by parties to a case after careful negotiation has produced agreement on their precise terms," <u>U.S. v. Armour & Co.</u>, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757 (1971), a district court may not "expand or contract the agreement of the parties as set forth in the consent decree . . ." <u>Berger v. Heckler</u>, 771 F.2d at 1568 (citation omitted). "At the same time, however, because a consent decree is a court-approved order, a district court has broad equitable discretion to enforce the obligations of the decree." <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir. 1995); <u>see</u> <u>also</u> <u>E.E.O.C. v. Local 580 Int'l Apprentice-Journeyman Educ. Fund</u>, 925 F.2d 588, 593 (2d Cir. 1991) (stating that a court's "judicial discretion in flexing its supervisory and enforcement muscles is broad."). As the Second Circuit has explained:

> "The Court has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties. Unlike a private agreement, a consent judgment contemplates judicial interests apart from those of the litigants. Until parties to such an instrument have fulfilled their express obligations, the court has continuing authority and discretion – pursuant to its independent, juridical interests – to ensure compliance." <u>E.E.O.C. v. Local 580</u>, 925 F.2d at 593; <u>see</u> <u>also</u> <u>United States v. Local 359</u>, 55 F.3d 64, 69 (2d Cir. 1995) (stating that "the court's interest in protecting the integrity of such a decree

justifies any reasonable action taken by the
court to secure compliance").

Here, the Court's 2004 Order was a reasonable action
undertaken to ensure compliance with Section II of the consent
decree, which recited the HPD's Standard Operating Procedure for
the internal review of complaints against police officers.
Defendants do not dispute the Special Master's finding that by
2003, there was "a significant backlog of uncompleted citizen
complaint investigations" [Doc. No. 112 at 12] and that "[the 2004
Order] emphasizes a matter that was part of the Original Cintron
Complaint settlement: the matter of citizen complaints, which was
part of [the Consent Decree] and is an issue that has been
important to the Plaintiffs." [Doc. No. 112 at 17].  Nor do they
dispute the finding that "[i]t is clear that the 2004 Order
mandated a whole procedure which was not only about a backlog of
investigations, but about creating a system in which the citizens
had rights, the investigation techniques had teeth, and priorities
were set in stone so that citizens had some assurance that the
right attention would be paid to complaints; attention that would
be expeditious, full, and fair, with due process appeal rights for
the citizen complainant established in the process, and with
multiple layers of review." [Doc. No. 112 at 17-18].  Moreover,
both parties participated in the extensive negotiations resulting
in the 2004 Order.  Thus, even if the 2004 Order did not reflect

the parties mutual understanding of the "best way to proceed", it was nonetheless a reflection of an agreement that, as Defendants themselves note, "gathered the support of both parties." [Doc. No. 118 at 18].

Mayor Perez's second objection is that he cannot be held in contempt of the Consent Decree because he has never been a party to this litigation. In addition, he argues that the Special Master's decision to substitute him as a Defendant in place of the former City Manager had no legal or factual justification.

Generally, a non-party to a consent decree cannot be held in contempt of that decree. In <u>Badgley v. Vargas</u>, 729 F.2d 894 (2d Cir. 1984), the Second Circuit overturned a district court order requiring non-party state officials to take action to implement a consent judgment entered into between plaintiff inmates and county officials. The Court based its decision in part on the fact that the state officials were non-parties to the consent judgment, arguing that the availability of a remedy that could be directed solely to the parties who signed the consent judgment and that would secure compliance, "in light of the non-acquiescence of the State defendants in the consent judgment and the advent of <u>Penhurst II</u>, makes it inappropriate to order any relief against the State defendants at this time." 729 F.2d at 901.

A decade later, in <u>Association for Retarded Citizens of Connecticut, Inc. v. Thorne</u>, 30 F.3d 367 (2d Cir. 1994), the Second

Circuit considered whether the All Writs Act[11] could justify the addition of a non-party to an action on a consent decree because that non-party was allegedly "in a position to completely frustrate the implementation of the Final Order." 30 F.3d at 370. In holding that the All Writs Act did not justify such an action, the determinative factor for the Court was the fact that the court's order was entered as a consent decree and did not involve an adjudication on the merits. Id. The Court stated:

> "Where the district court exercises its jurisdiction to rule on the merits of a litigation, it determines that the law requires a certain outcome and is empowered to issue remedial orders to effectuate that outcome. By power of the All Writs Act, it may require the compliance of non-parties in order to ensure that its legally-mandated directives are not frustrated. In contrast, where a district court enters a privately negotiated consent decree, it does not determine that the obligations assumed by the parties are required by law." Id.

Thus, the Court found that "because the terms of the consent decree were voluntarily assumed rather than legally imposed, there

---

[11]The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court has interpreted the Act to "authorize a federal court 'to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" Pennsylvania Bureau of Corrections v. U.S. Marshals Serv., 474 U.S. 34, 40, 106 S.Ct. 355, 360 (1985) (internal quotations omitted). "The power of the Act extends, under appropriate circumstances, to persons who though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373 (1977).

[was] no basis for extending the negotiated outcome to a non-party." Id.[12]   Here, Mayor Perez is a non-party to the negotiated outcome that resulted in the 1973 Consent Decree.  Thus, he cannot be held in contempt as a non-party.

However, Special Master Bieder properly substituted Mayor Perez for the former City Manager, who was a party to this litigation, under Rule 25(d) of the Federal Rules of Civil Procedure.  Thus, Mayor Perez was properly held in contempt for violations of the 2004 Order.

Rule 25 governs the substitution of parties in cases of death [Fed. R. Civ. P. 25(a)], incompetency [Fed. R. Civ. P. 25(b)], transfer of interests [Fed. R. Civ. P. 25(c)] and changes in public office [Fed. R. Civ. P. 25(d)].

Rule 25(d) provides, in pertinent part:

> "When a public officer is a party to an action in his official capacity and during its pendency dies, resigns , or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party . . . An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution."

Rule 25(d) is commonly invoked in the context of one

---

[12]The Court also noted that, had the original judgment involved an adjudication that plaintiff's constitutional rights were violated, rather than a judgment based solely on a consent decree, the district court could use its power under the All Writs Act to require non-parties not to frustrate its remedial orders.  30 F.3d at 371.

individual succeeding another individual in the same position that is a party to the ongoing litigation. See, e.g., Harris v. United States, 447 F. Supp.2d 208 (D. Conn. 2005) (Alberto Gonzales substituted for John Ashcroft as Attorney General). However, substitution under Rule 25(d) is not limited to the technical successor of the original officer in the action, but extends to persons to whom the duties and responsibilities of the original officer have been transferred. See e.g. Porter v. American Distilling Co., 71 F.Supp. 483 (S.D.N.Y. 1947) (where functions of the Price Administrator were transferred to the Temporary Controls Administrator, the latter was the "successor in office" of the Price Administrator under Rule 25(d)).

Mayor Perez argues that he is the successor to the Mayor of the City of Hartford in 1969, who was never a party to this litigation. However, the adoption of a new city Charter in 2004 fundamentally changed the powers and duties of the mayoral office, effectively replacing the office of City Manager (who was a party to this litigation in his official capacity) with the office of the Mayor.

Under the old Charter (as it existed when the parties entered into the Consent Decree), the City Manager was defined as the chief executive officer of the City of Hartford and was responsible "to the council for the administration of all departments and agencies of the city government except in those cases where the head of the

department or agency is appointed by the council or elected by the people." Chapter V § 3 [Ct. Ex. 27]. The City Manager was also given the power to "supervise, direct and control the operation of all departments and agencies under his jurisdiction," the power to "appoint the heads of all departments . . . [and] the power to remove any officer or employee appointed by him." Id.

When the Charter was revised in 2004, the role of the City Manager disappeared. Instead, the Charter significantly strengthened the Mayor's role, defining *him* as "the chief executive officer of the City." Chapter V § 21 [Ct. Ex. 26]. The new Charter vested the Mayor with the same powers and duties of the former City Manager, including the power to hire and fire department heads. In addition, the new Charter directed the City Council to "recodify the provisions of the 1947 Act and . . . replace all references to the 'City Manager' that are contained in or pertain to the 1947 Act with the term 'Mayor' as permitted by the General Statutes." Chapter XII § 1(d) [Ct. Ex. 26].

In short, the Mayor replaced the City Manager as the "chief executive officer" of Hartford, acquiring the powers and duties of that position. For this reason, the Court finds that Special Master Bieder's decision to substitute Mayor Perez in his official capacity for the former City Manager office was proper under Rule 25(d).

## **CONCLUSION**

For the foregoing reasons, the Special Master's Report [Doc. No. 112] is affirmed and adopted, subject to the modifications stated herein.


SO ORDERED


_____/s/_____

ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this 28th day of November 2007.